IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED SEP 24 2012 CLERK, U.S. DISTRICT COURT ALEXANDRIA, VIRGINIA

YVETTE M. WINDER, )
)
    Plaintiff )
)
v. ) 1:11cv956 (LMB/TRJ)
)
MICHAEL J. ASTRUE, Commissioner, )
Social Security Administration, )
)
    Defendant. )

## MEMORANDUM OPINION

Before the Court are the plaintiff's timely objections to a Report and Recommendation ("Report") issued by a magistrate judge, which recommended that defendant's motion for summary judgment be granted. For the reasons stated below, the Court will adopt the magistrate judge's Report and grant defendant's motion for summary judgment.

### I. BACKGROUND

On December 19, 2006, Yvette Winder ("Winder") applied for disability insurance benefits, alleging disability from that date. Administrative Record ("R.") at 114, 117-18. Winder, a 34-year-old mother of three children with years of experience as a medical assistant and caregiver, described her disability as arising from chronic autoimmune hepatitis that caused her migraines as well as severe back, knee, and abdominal pain. R. at 114, 117-18, 126, 132, 140. She reported that she was taking nine medications and that since the onset of her illness, she

had become constantly fatigued, unable to stand or walk for long periods of time, and unable to lift heavy objects. R. at 122, 132, 136. Although it acknowledged that she had "hepatitis, knee and back pain," the Social Security Administration ("SSA") denied her application on March 8, 2007, determining that Winder was not disabled because "[t]here is no evidence of significant loss or disabling complications from [the] hepatitis" and "medical records show that [Winder is] able to stand, bend, move and use [her] legs and hands in a satisfactory manner." R. at 51-53. On October 12, 2007, the SSA affirmed the denial after receiving Winder's request for reconsideration and reviewing additional evidence. R. at 57-61.

Winder asked for an evidentiary hearing before an Administrative Law Judge ("ALJ"). R. at 62-63. The hearing, at which Winder was represented by counsel, was held on September 16, 2009.[1] R. at 30-47. In a decision issued on November 4, 2009, the ALJ found that although Winder had several "severe" impairments, she did not qualify as "disabled" under SSA regulations because she retained residual functional capacity to perform sedentary, unskilled work. R. at 15-29. Using the five-step analysis prescribed by 20 C.F.R. § 404.1520 for evaluating claims for disability benefits, the ALJ made findings

---

[1] The magistrate judge's Report incorrectly indicates that the hearing was held on September 26, 2009. See Report at 1-2.

2

that Winder (1) had not been gainfully employed since the alleged onset of her disability; (2) had several severe impairments, including autoimmune hepatitis, gastrointestinal problems, osteoarthritis[2] of the knees, synovitis[3] of the wrists, mild pulmonary hypertension, obesity, and depression; (3) did not have a severe impairment meeting the criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) did not have residual functional capacity to perform past relevant work; but (5) retained residual functional capacity to perform a range of sedentary, unskilled work with a sit/stand option and limited dominant hand usage. R. at 20-27. Based on the testimony of a vocational expert, the ALJ found that there were several representative examples of jobs in the national economy that a person with Winder's residual functional capacity could perform on a sustained basis, including positions as a surveillance system monitor, information clerk, and document preparer. R. at 28, 43. Winder's request for further reconsideration was denied by the SSA Appeals Council on May 25, 2011, rendering the ALJ's decision the final decision of the Commissioner. R. at 4-6.

---

[2] Osteoarthritis is characterized by "erosion of articular cartilage" especially affecting "weight-bearing joints," and resulting in "pain and loss of function." Stedman's Medical Dictionary 1388 (28th ed. 2006).

[3] Synovitis is "[i]nflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis." Stedman's Medical Dictionary, supra, at 1920.

3

After receiving an extension of time to file a civil action for review of the Commissioner's decision, plaintiff filed her complaint. R. at 1-3. The parties' cross-motions for summary judgment were considered by a magistrate judge who issued a Report on April 30, 2012, recommending that plaintiff's motion for summary judgment should be denied and defendant's motion for summary judgment should be granted. The parties were advised that any objections to the Report had to be filed within 14 days and that failure to file timely objections waived the right to appeal the substance of the Report and any judgment based upon the Report. Plaintiff timely filed her objections, which are now before the Court.

In her objections, Winder focuses on the magistrate judge's conclusion that the ALJ did not err in assigning limited weight to the medical opinions of two of her examining rheumatologists, Dr. Jennifer Odutula and Dr. Matthew Swartz.

The record shows that Winder was referred to Dr. Odutula for the treatment of joint pain associated with autoimmune hepatitis. Dr. Odutula examined her on seven occasions between February 2008 and June 2009. R. at 703-18. A Residual Functional Capacity ("RFC") assessment that Dr. Odutula prepared in June 2009 portrayed plaintiff as virtually unable to work an eight-hour day; for example, it stated that Winder was severely limited in her ability to handle work stress, could sit for no

more than 20 minutes or stand for no more than 10 minutes at a time, could sit or stand for fewer than two hours in an eight-hour work-day, needed frequent one- to two-hour breaks during a work-day, and was likely to be absent from work more than three times a month due to chronic pain. R. at 168-72.

Winder was referred to Dr. Swartz for evaluation of her ongoing knee pain. R. at 643. Dr. Swartz examined her on a single occasion in April 2007. Id. In a one-page letter from Dr. Swartz to Winder's primary care physician, he stated:

> In summary, Ms Winder presents with early osteoarthritis probably affecting her back and knees. While there is potential for rehabilitation at this point her use of prescription strength analgesia portends poorly for optimal outcome and her return to the workplace. I am not in a position to quantify her use of these analgesics and therefore would defer the management to either your practice or someone who can assist her in eliminating their use safely.

Id.

## II. DISCUSSION

### A. Standard of Review

When a social security claimant appeals a final decision by the Commissioner denying disability benefits, judicial review by the district court is limited to determining whether, based on the entire administrative record, the Commissioner's decision is "supported by substantial evidence and whether the correct law was applied." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir.

2002); see also 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla but may be somewhat less than a preponderance." English v. Shalala, 10 F.3d 1080, 1084 (4th Cir. 1993) (quotations omitted).

If a party files written objections to the magistrate judge's Report, as the plaintiff has timely done in this case, the district judge must make a de novo determination of those portions of the Report to which objection is made and either accept, reject, or modify the magistrate judge's findings or recommendations. See 28 U.S.C. § 636(b)(1).

B. Analysis

After reviewing the entire administrative record and the magistrate judge's Report de novo, the Court finds that the Report is well-reasoned and supported by the record and the applicable law. For the reasons set forth below, Winder's objections to the Report, asserting that the ALJ erred in weighing the medical opinions of Dr. Odutula, Dr. Swartz, and various other physicians, are without merit.

1. Dr. Odutula's Assessment

Winder first objects to the ALJ's decision not to accord "great and controlling weight" to Dr. Odutula's RFC assessment. Plaintiff's Objections ("Pl.'s Obj.") at 6. The opinion of a

6

treating physician is generally entitled to more weight than the opinion of a non-treating physician, due to the existence of a treatment relationship in which the treating physician has necessarily examined a patient over a period of time. See Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). Yet a treating physician's opinion is only given "controlling" weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); see Winford v. Chater, 917 F. Supp. 398, 400 (E.D. Va. 1996).

Here, the ALJ stated that

> Limited evidentiary weight has been assigned the medical source statement completed by Dr. Odutula in May 2009,[4] which indicates that the claimant was unable

---

[4] The ALJ incorrectly identifies a May 2009 RFC assessment that was actually completed by Dr. Richard Ospina as having been completed by Dr. Odutula. See R. at 697-701. No doubt this error springs in part from Winder's own mislabeling of the document as Dr. Odutula's assessment. R. at 696. Regardless, as the magistrate judge properly noted, any such error is harmless. First, the differences between Dr. Ospina's RFC assessment and the actual RFC assessment of Dr. Odutula do not appear to differ in respects that would affect the ALJ's credibility finding as to Dr. Odutula. Not only do both RFCs effectively conclude that Winder would be unable to complete an 8-hour work-day, but the ALJ's concern that Dr. Ospina's RFC indicated a treatment relationship only since January 2008, "well after the alleged onset date of disability," would only be magnified by reference to the actual RFC assessment of Dr. Odutula, which showed a course of treatment since February 2008. See R. at 168-72, 697-701. Despite confusing the two assessments, the ALJ's correct citations to and discussion of

7

to sit, stand, and/or walk for a total of eight hours
a day, among other disabling limitations.  First, Dr.
Odutula indicated that she had treated the claimant
since January 2008, well after the alleged onset date
of disability in December 2006.  Her assessment was
apparently also based in large part, if not entirely,
on the claimant's own self-report of pain rather than
any objective clinical findings.  Dr. Odutula's
treatment notes also reveal a relatively infrequent
and conservative course of treatment, and certainly do
not support the degree of functional limitations as
contained in her medical source statement.  In fact,
the same month, May 2009, she indicated that the
claimant was in no acute distress and ambulated
normally; that she was active, alert, and oriented in
all three spheres; and that she had normal motor
strength and tone with normal movement of all
extremities.

R. at 26-27. The ALJ declined to afford Dr. Odutula's RFC assessment controlling or great weight based on inconsistencies between Dr. Odutula's treatment notes and an RFC assessment concluding that Winder was virtually unable to survive in the workplace. For example, on her first examination of Winder, Dr. Odutula noted that Winder was "not in acute distress" and had "mild crepitus"[5] and "tenderness" in her knees. R. at 717-18. Although Winder also initially presented with "[s]ignificant synovitis affecting both wrists," R. at 718, on each of the following six examinations, Dr. Odutula only reported

---

Dr. Odutula's treatment notes indicate that his overall credibility finding is well-supported by the record. R. at 27.

[5] Crepitus refers to "the grating of a joint, often in association with osteoarthritis." Stedman's Medical Dictionary, supra, at 457.

8

"tenderness" and "degenerative changes," but no synovitis. R. at 704, 707, 709, 711, 713, 715. Moreover, Dr. Odutula's notes from two examinations of Winder during May and June 2009 stated that Winder was "ambulating normally" and that she had "normal motor strength," "normal tone," and "normal movement of all extremities." R. at 704, 707. These observations contrast strikingly with the assessment that Dr. Odutula prepared during the same time period predicting that Winder could not sit, stand, or otherwise function during an eight-hour day of work. See R. at 168-72. Even alone, such a disparity constitutes a valid reason for not affording Dr. Odutula's RFC assessment "controlling" weight.

Winder argues that Dr. Odutula's assessment should at least be given "great" weight, particularly relative to the assessments of other doctors with whom Winder had much less contact. Usually, the opinion of a treating physician who has examined a patient and has a treatment relationship with the patient is entitled to more weight than the opinion of a non-treating physician, Johnson v. Barnhart, 434 F.3d at 654, but the ALJ has discretion to give less weight to that testimony if there is "persuasive contrary evidence," Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). See 20 C.F.R. § 404.1527(c)(2-6) (setting forth non-exhaustive list of factors for an ALJ to

consider in evaluating any medical opinion not given controlling weight).

Dr. Odutula's assessment of Winder's inability to return to work was significantly impugned by other evidence in the record to which the ALJ explicitly referred.[6] See R. at 24-25. For instance, radiological diagnostic tests from March 2007 on Winder's knees concluded that there was only "slight" narrowing of the medial joint space compartments and "[n]o acute abnormalit[ies]" in either knee, R. at 531-32, and tests from March 2008 showed that although there was some "narrowing of the medial compartment" the "[r]emaining osseous and soft tissue structures are normal," R. at 744. Radiologists reached similar findings six months before the alleged onset of disability in December 2006, opining that there were "no abnormalities" in the knees other than "[m]inimal findings suggesting early degenerative changes of the medial[] aspect of the knees, bilaterally." R. at 185. Another doctor noted in November 2006 that Winder was "[a]ble to walk heel to toe [in a] straight line with 3 inch high heel boots on." R. at 199. These assessments of Winder's joint condition comport with other evidence in the

---

[6] Winder objects that the ALJ did not clearly indicate any contradictory evidence in the record that supports rejection of Dr. Odutula's assessment. To the contrary, the ALJ cited to such evidence throughout his written decision. Not reiterating that evidence in the same paragraph in which he discussed the overall credibility of Dr. Odutula's assessment does not undermine his findings.

record, such as the state agency physicians' remarks that "[a]lthough the claimant alleges significant limitations, the field office personnel observed her to have no difficulties while at the field office," R. at 364, and that Winder remained capable of "light work," R. at 667. On the basis of such inconsistencies with other aspects of the record, sufficient evidence justified the ALJ's decision not to accord Dr. Odutula's RFC assessment great weight. Cf. Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) (sufficient evidence justified the ALJ's rejection of treating physician's opinion where other evidence in the record, including the treating physician's own medical notes, was inconsistent with the physician's determination of disability).

Winder also asserts for the first time on appeal that the ALJ was obligated to re-contact Dr. Odutula for further clarification after finding her RFC assessment inconsistent with the record. Pl.'s Obj. at 7. This misstates the applicable law, which makes such action by the ALJ permissive, not mandatory. See 20 C.F.R. § 404.1520b(c) (stating that if there is insufficient evidence in the record or a conclusion cannot be reached as to whether a claimant is disabled, the Commissioner will "determine the best way to resolve the inconsistency or insufficiency," and "may recontact [a] treating physician, psychologist, or other medical source" (emphasis added)).

11

## 2. Dr. Swartz's Assessment

Winder's remaining objection concerns the ALJ's lack of consideration of the written opinion of another rheumatologist, Dr. Swartz, who examined Winder on one occasion and stated in a letter that Winder's use of prescription-strength pain-killers "portends poorly for . . . her return to the workplace." R. at 643. Winder argues that even if Dr. Swartz was not a treating physician with whom she had an ongoing relationship, his status as a specialist compelled the ALJ to give his opinion greater deference. Pl.'s Obj. at 7-8.

Dr. Swartz's specialization in rheumatology does not, by itself, require the ALJ to assign his opinion greater weight than that of any other physician; rather, it is but one factor in a non-exhaustive list of factors to be considered. See 20 C.F.R. § 404.1527(c)(2-6). Indeed, several other factors weigh against assigning great credibility to Dr. Swartz's opinion: Dr. Swartz examined Winder on only one occasion, he qualified the prediction in his letter with the disclaimer that he was "not in a position to quantify [Winder's] use of [] analgesics," and the only evidence accompanying Dr. Swartz's one-page letter was a one-page examination record that did not explain or offer evidence corroborating his prediction. See R. at 643-44.

Moreover, as the magistrate judge correctly noted, to the extent that Dr. Swartz's letter expresses an opinion on Winder's

12

ability to return to work, that portion of his opinion is a legal conclusion that is persuasive only if supported elsewhere in the record. See Morgan v. Barnhart, 142 F. App'x 716, 721-22 (4th Cir. 2005) (finding that a physician's opinion that a claimant "can't work a total of an 8 hour day" was clearly a legal conclusion entitled to no heightened evidentiary value); 20 C.F.R. § 404.1527(a)(2), (d)(1) (describing the difference between medical opinions that "reflect judgments about the nature and severity of [a claimant's] impairment(s)" and opinions as to the ultimate issue of whether a claimant is disabled, such as statements that a claimant is "unable to work"). Any error by the ALJ in omitting discussion of Dr. Swartz's letter was harmless given its very limited contribution to the record.

### 3. Citations to Other Medical Records

Even though Winder did not specifically raise objections relating to credibility findings about doctors other than her two rheumatologists, she vaguely refers in her objections to the ALJ's failure to consider the medical opinions of "the treating physicians" or "the examining doctors," and cites numerous hospital visits and examinations by other physicians from as early as August 2006 in her statement of facts that relate to her back, knee, and abdominal pain. Pl.'s Obj. at 2-7. The Court has reviewed all of Winder's citations and finds that the

record does not support a finding that the magistrate judge erred, but instead indicates significant confusion among physicians as to the nature of Winder's condition.

With regard to Winder's back pain, Winder's citations to records from as early as August 2006 neglect to mention one physician's finding on August 4, 2006, which stated that "[r]adiographic examination of the bones, soft tissue, and[] joint space of the [lumbar spine] area demonstrates no abnormalities." R. at 349. Winder refers to a five-day hospitalization for severe lower back pain starting on January 18, 2007, but the records to which she cites actually indicate that there was "[n]o need for inpatient care at this point," and that Winder signed papers showing that she was discharged on the same day that she was examined. R. at 492, 494-96. Indeed, on that occasion, the record reflects that she had only "mild tenderness" in her back, the etiology of her back pain was "unclear" but the pain was "most likely caused by a strain of the muscles or ligaments that support the spine," and the antibiotic prescriptions that Winder labels as medications for her back pain were actually intended, at least in part, to treat a urinary tract infection. R. at 491-92, 494-96.

With regard to records associated with her knee pain, Winder refers to an August 18, 2006 hospital visit; however, the radiologist who examined her x-rays that day found "no

14

abnormalities" other than "[m]inimal findings suggesting early degenerative changes of the medial[] aspect of the knees, bilaterally." R. at 346-47. Although a treatment record from March 8, 2007, shows that Winder was diagnosed with "non-specific" musculoskeletal pain, a handwritten note in the record indicates that she was "well appearing." R. at 524, 526-28.

Winder also refers to her September 20, September 23, and December 28, 2006 hospital visits, during which she was diagnosed with chronic autoimmune hepatitis, as well as gastritis,[7] esophagitis,[8] arthralgia[9] of the knee, and a large hernia in her stomach. R. at 918-919, 185, 183, 228-30. The record also includes a December 19, 2006 examination after which one physician commented that Winder's hepatitis had an "[i]mproved biocehmical [sic] profile, but persistent symptoms, which appear out of proportion for autoimmune hepatitis, and [are] not improved with Rx." R. at 190.

Winder accurately recalls receiving a prescription for the narcotic Percocet on February 26, 2007, but omits that Dr. Douglas Smith was unable to determine the cause of her abdominal

---

[7] Gastritis is "[i]nflammation, especially mucosal, of the stomach." Stedman's Medical Dictionary, supra, at 790.

[8] Esophagitis is "[i]nflammation of the esophagus." Stedman's Medical Dictionary, supra, at 670.

[9] Arthralgia is defined as "[p]ain in a joint." Stedman's Medical Dictionary, supra, at 159.

15

pain, R. at 512, 519, and that a sonogram of her abdomen noted "[n]o significant abnormalities," R. at 514. Winder states that she visited a hospital on May 26, 2007 for severe abdominal pain and that Dr. John Maguire, who also could not diagnose the etiology of her pain, prescribed Ibuprofen. R. at 543-45. But the records from that day's examination also note that Winder was no longer taking Percocet, that she appeared to be "improving spontaneously" while she was at the hospital, and that her final diagnosis was, "abd[ominal] pain, resolved, unclear etiol[ogy]." R. at 540-43.

Physicians were similarly unable to determine the cause of her abdominal pain on July 9, 2007, although Winder was again prescribed an unspecified narcotic. R. at 561-62. Winder then cites Dr. Michael Garone's diagnosis of esophagitis, gastritis, and hernia on August 1, 2007, R. at 580-81, and to a protracted hospitalization on August 24, 2007 for gastrointestinal bleeding, R. at 622-24. Yet one treatment note that appears to be from the same August 24, 2007 hospital visit suggests that Winder was "stable to be discharged today." R. at 628.

Winder mentions several appointments in 2007 with Dr. Khairunnisa Masood, over the course of which "Dr. Masood ordered multiple tests from various specialists and laboratories to determine the nature and etiology of Ms. Winder's illnesses and to substantiate his clinical findings." Pl.'s Obj. at 4. Those

16

tests reported conditions inconsistent with Winder's claim of being disabled. For example, an April 2007 gastric emptying study was "[n]ormal" and a CT scan of the abdomen and pelvis during the same month was "unremarkable," save for "[p]ossible constipation" and an ovarian cyst. R. at 642, 645. Dr. Masood's notes indicate that Winder requested pain medication on at least two occasions, R. at 637-38, and reflected significant confusion over her abdominal pain and inconsistency in prescribing her pain medication. R. at 635-641.

Winder also referred to several appointments between 2007 and 2009 with Dr. Michael Garone, during which Dr. Garone diagnosed her with GERD[10] and gastroparesis[11] in addition to autoimmune hepatitis. R. at 867-68. But three of the appointments to which she refers were actually with other physicians from Dr. Garone's practice, R. at 869-71, 875-79, one of whom noted in March 2007 that Winder's abdomen was normal, that her abdominal pain, nausea, and vomiting "could be related to reflux," and that "[h]er narcotic use may be contributing to the problem," R. at 681-82. That physician ordered a CT scan "to rule out other abdominal pathology," R. at 682, which was

---

[10] "GERD" is an abbreviation for "gastroesophageal reflux disease." Stedman's Medical Dictionary, supra, at 801.

[11] Gastroparesis is defined as "[w]eakness of the gastric peristalsis, which results in delayed emptying of the bowels." Stedman's Medical Dictionary, supra, at 793.

done later that month, R. at 645. Notes pertaining to Winder's appointments with Dr. Garone show that her physical exams were normal and that she was counseled repeatedly to modify her diet and lifestyle. See R. at 874, 868, 865, 856, 852, 849. Notably, in November 2007, Dr. Garone opined that "[t]he patient's conditions appear to be well controlled with the current therapeutic regimen," R. at 868; in April 2008, he wrote that her GERD "appears to be under control," R. at 863; and his November 2008 notes reflect that, "[d]ietary and lifestyle changes are necessary for symptomatic control," R. at 856.

In sum, plaintiff's citations from the record raise more confusion than they resolve. Although there is extensive documentation that plaintiff suffers from several serious and painful impairments, this evidence alone does not undermine the magistrate judge's conclusion that there is substantial evidence to support the ALJ's finding that despite these ailments Winder retains the residual functional capacity to perform work.

III. CONCLUSION

For the reasons stated above, defendant's Motion for Summary Judgment will be granted and plaintiff's Motion for Summary Judgment will be denied by an Order to be issued with this memorandum opinion.

Entered this 24th day of September, 2012.

Alexandria, Virginia

/s/ JMB

Leonie M. Brinkema
United States District Judge